Opinion issued February 28, 2025



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00158-CV

———————————

**MARK ALAN SWANSON, Appellant**

**V.**

**ROBERT DANNY CLACK, II, Appellee**

---

**On Appeal from the 127th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-29199**

---

## MEMORANDUM OPINION

This appeal arises from a suit to declare the validity of a nonjudicial foreclosure and a counterclaim for conversion. Appellant Mark Alan Swanson foreclosed on a deed of trust that secured the seller-financed note on residential real property he sold to appellee Robert Danny Clack, II. Clack counterclaimed for

conversion of personal property, claiming Swanson had unlawfully removed his property from the house.

The trial court rendered partial summary judgment against Swanson holding the foreclosure and corresponding Special Warranty Deed, which conveyed the property to Swanson as the highest bidder, both were void. Clack's remaining conversion claim was tried to a jury. At the beginning of trial, Clack's attorney read to the jury multiple deemed admissions that were relevant to the conversion claim. Clack's testimony centered on the identity and value of the allegedly converted property. The jury found that Swanson had converted Clack's property and that he had done so with malice. In a granulated question, the jury determined that a total of $57,400 would fairly and reasonably compensate Clack for the loss of 57 separately identified personal property items or groups of items. The jury also awarded $200,000 in exemplary damages and trial and conditional appellate attorney's fees. The trial court later granted Swanson's motion for judgment notwithstanding the verdict in part, reduced the compensatory damages to $50,800, reduced the exemplary damages proportionally to $178,045, and entered judgment on the verdict for actual and exemplary damages, $96,750 in past attorney's fees, plus pre- and post-judgment interest, and conditional appellate attorney's fees.

Both Swanson and Clack appealed. Swanson raises nine issues on appeal, challenging the awards of actual and exemplary damages for conversion, and trial

and conditional appellate attorney's fees.[1] Clack raises three issues in his cross-appeal, challenging the trial court's partial grant of Swanson's judgment notwithstanding the verdict and reduction of actual and exemplary damages.[2]

We hold that the evidence was legally and factually sufficient to support the jury's verdict for conversion and conversion damages, and that the trial court erred by partially granting judgment notwithstanding the verdict reducing the conversion amounts found by the jury. We modify the judgment of the trial court to award Clack the amount of $57,370 in compensatory damages, and we affirm as modified. We further hold that the award of trial attorney's fees in favor of Clack was not supported by legally sufficient evidence because the evidence presented at

---

[1] Swanson's first three issues challenge the award of damages for conversion. In the first and third issues, he challenges the legal and factual sufficiency of the evidence to support the jury's verdict that he converted the property listed in the jury charge and the compensatory damages found by the jury. In his second issue, he asserts that there was no jury finding on causation. In issues four through seven, Swanson challenges the award of attorney's fees. In issues four and five, he asserts that Clack was not entitled to attorney's fees for successfully defending Swanson's declaratory judgment action and that the amount of attorney's fees awarded was not supported by legally and factually sufficient evidence. In issues six and seven, Swanson asserts that Clack was not entitled to conditional appellate attorney's fees and that the amount of conditional appellate attorney's fees awarded was not supported by legally and factually sufficient evidence. In issue eight, Swanson alleges that the jury's finding of malice and the exemplary damages award were not supported by legally and factually sufficient evidence. In issue nine, he asserts that the exemplary damages award was excessive.

[2] In his first two cross-issues, Clack argues that the trial court erred by substituting its own judgment about the value of a car and a trailer and reducing the compensatory damages for those items from the amounts found by the jury. In his third cross-issue, Clack argues that the trial court erred by proportionally reducing the exemplary damages.

trial failed to segregate fees incurred for discrete legal services that were recoverable from those that were unrecoverable. We therefore we reverse the award of trial attorney's fees and remand to the trial court for a new trial on Clack's trial attorney's fees for defending against the declaratory judgment claim.

At oral argument, Clack conceded that he was not entitled to appellate attorney's fees because Swanson's appeal did not challenge a cause of action for which attorney's fees are recoverable, so we render judgment that Clack take nothing on contingent appellate attorney's fees.

Finally, because we conclude that the award of exemplary damages was unconstitutionally excessive, we suggest a remittitur in the amount of $63,305.

## Background

### I. Swanson sells a house to Clack.

Swanson has been in the real estate business for about 15 years. Although he typically leased properties to tenants, owner-financed sales appealed to him because they alleviated the burden of home repairs. Swanson testified that, over 15 years, he had been involved with eight evictions and three owner-financed sales. Before this case, he had never instituted foreclosure proceedings.

Clack is a former U.S. Marine, who had worked for the Texas Department of Criminal Justice as a corrections officer supervisor, a commercial driver, and an apartment maintenance worker, before becoming licensed to do air conditioning

repair. By the time of trial, he had been working for himself doing air conditioning repair and running a custom t-shirt business for several years.

Clack had performed air conditioning repair services for Swanson. In August 2017, Clack needed to find a new personal residence. Clack discussed purchasing a house from Swanson, who agreed to owner financing after conducting a background check (but not a credit check) on Clack.

On August 22, 2017, Swanson, doing business as "AMV Properties," sold a house to Clack for $174,800 at 8.25% interest for a term of 30 years. The monthly note was $1,313.21. The Note was secured by a Deed of Trust, and both documents described the property as Lot 373, Block 14 of Woodcreek, Section 2. Clack moved in and began making monthly mortgage payments. When his work declined in the aftermath of Hurricane Harvey, Clack fell behind on his payments. Clack testified that he paid the January 2018 mortgage note on February 13, 2018, but he did not pay the February mortgage at all.

## II.    Swanson forecloses and attempts to evict Clack.

On February 15, 2018, Swanson sent Clack a letter by certified mail informing him that his mortgage payments for January and February 2018 were past due in the amount of $2,626.42, and that a total of $5,438.78 in taxes were due to Harris County, Aldine ISD, and the Woodcreek MUD. Swanson stated: "If these amounts are not procured within twenty (20) days I intend to foreclose." In

furtherance of the foreclosure, on March 8, 2018, the Substitute Trustee sent Clack, by certified mail, a Notice of Substitute Trustee's Sale. Although the street address was correctly identified, the metes and bounds description stated, "Lot 375," instead of "Lot 373." On April 3, 2018, the property was sold at auction to Swanson, the highest bidder, who paid $105,000. The Substitute Trustee's affidavit and the Special Warranty Deed both included the same error in describing the lot as "375" instead of "373."

On April 12, 2018, Clack was served with citation of Swanson's eviction suit. Swanson's original petition for eviction, a form that he filled out by hand, indicated that Clack had failed to pay $1,313.21 in rent in February, and requested judgment of $3,939.53 in unpaid rent. On April 24, 2018, the justice of the peace dismissed the eviction proceeding due to lack of jurisdiction.

On April 30, 2018, Swanson filed suit seeking a declaration that the foreclosure was valid. Clack maintained throughout the litigation that the foreclosure was invalid,[3] and he filed a counterclaim seeking a declaratory judgment that the foreclosure and corresponding Special Warranty Deed were

---

[3]     Clack also testified that he had no notice of the foreclosure until after he obtained counsel in connection with the eviction.

void. The trial court eventually granted summary declaratory judgment in Clack's favor on this issue.[4]

### III. Clack remains in the house, despite Swanson's alleged interference.

Meanwhile, about two months after Swanson filed suit for a declaration of the validity of the foreclosure, Clack's attorney sent Swanson's attorney a letter stating that, although Swanson "was not awarded a writ of possession" in the eviction suit, "he and his agents have gone on the property, into the house, and rummaged through the mailbox numerous times." Clack's attorney demanded that Swanson cease and desist from entry onto the property, talking to the neighbors, or posting documents about debt Clack allegedly owed.

Clack continued living in the property in 2018 and made some mortgage payments. The record on appeal includes a cashier's check for $1,313.21 dated February 13, 2018, and notices of deposits of the same amount each month from April through October of 2018. Clack testified that throughout 2018 Swanson and his agents continued to interfere with his enjoyment of the property by maligning him to his neighbors, entering his property, and rummaging through his mailbox.

---

[4] Swanson sold the house to third-party purchasers in May 2020, two years before the trial court ruled that the foreclosure was void.

7

Clack decided to move, and he started moving his belongings, a little at a time, to another residence in Grimes County in July or August 2019.[5]

## IV. Clack's personal property goes missing amidst dispute with Swanson.

In November 2019, Clack arrived at the house and saw a truck and trailer in the driveway, backed up to the garage. He did not know who was there, but he noticed that the lock on the gate was broken, and when he went into the backyard, he saw Swanson raking leaves. Clack demanded to know where his trailer was and called the constable's office. The constable spoke to both men. Clack told the constable that Swanson had stolen some of his belongings. Clack overheard Swanson tell the constable that he had evicted Clack, that the house was his property, and that he had changed the locks on the doors. Clack learned that, several days earlier, Swanson had been on his property with a different constable. Clack later watched a neighbor's Ring video footage that showed Swanson at the house on the earlier date with a trailer, opening the garage door. Clack understood that even though the matter involved his property, this was a civil dispute that had to be resolved in the courts. Clack later emailed the constables a list of items that he claimed were missing from his house as of the day he found Swanson on the property.

---

[5] Clack testified that he began moving out in July or August of 2019. However, he later testified that he had been living in the house in Grimes County since the middle of 2018.

8

**V.      Clack seeks actual and exemplary damages for loss of property.**

Clack maintains that he asked Swanson more than twelve times to return his belongings to no avail. In March 2020, Clack filed his "Counter-Plaintiff's First Amended Counterclaim," alleging that on or around November 19, 2019, Swanson changed the locks on the house, and that personal property worth more than $50,000 had gone missing, "including a customized car and its trailer." Clack also alleged that the wires were cut to security cameras, that the recording device that would have recorded what happened was missing, that computers and printers were left by the street as trash, and that some of his possessions were spotted outside near a used car dealership building owned by Swanson. Although he did not expressly plead "conversion," he sought "return of his property and the value of what is missing." Clack later again amended his petition, pleading for exemplary damages "because Mr. Swanson entered the property knowing full well he had not actually evicted Mr. Clack and had no right to possession."

**VI.    Clack's claims are tried to a jury.**

The court held a jury trial on Clack's claim for conversion and for successfully defending Swanson's declaratory judgment claim.

## A.      Swanson's Deemed Admissions

At the start of trial, Clack's attorney read the following deemed admissions to the jury[6]:

1.      The Warranty Deed with Vendor's Lien showing Mark Swanson, a single person doing business as AMV Properties as Grantor and Robert Danny Clack, as Grantee, that Mr. Swanson signed on August 22, 2017 was a conveyance of Mr. Swanson's ownership in the property to Mr. Clack.

2.      The warranty deed was not a lease.

. . . .

4.      Mr. Swanson had no written lease with Mr. Clack for him to rent the property from Mr. Swanson that was in effect in 2018.

. . . .

10.     Mr. Swanson was present at the April 24, 2018 hearing in the eviction case.

11.     Mr. Swanson knew that the judge did not grant an order evicting Mr. Clack from the property in the eviction case.

12.     In November 2019, Mr. Swanson had no order from a court evicting Mr. Clack from the property.

. . . .

14.     The eviction case is not the only case Mr. Swanson has filed to evict a tenant from a piece of real estate Mr. Swanson owns in Harris County, Texas.

15.     Mr. Swanson owns and rents out several pieces of real estate in Harris County, Texas.

---

[6]     Some of the deemed admissions are duplicative, but we have included them here for the sake of completeness.

16. Since 2015, Mr. Swanson has filed at least four cases to evict tenants from property in Harris County, Texas.

17. Mr. Swanson was familiar enough with court procedures in April 2018 to know that the judge dismissing the eviction case did not mean he gave Mr. Swanson the right to evict Mr. Clack from the property.

18. Knowing that the justice court did not rule in Mr. Swanson's favor in the eviction case, Mr. Swanson still entered the house on November 17, 2019.

19. Even though Mr. Swanson knew that the justice court dismissed the eviction case and did not rule in Mr. Swanson's favor in the eviction case, Mr. Swanson still entered the house on November 17, 2019.

20. Sometime after the disputed foreclosure Mr. Swanson entered into an arrangement to sell that property for more than $175,000.

. . . .

33. Mr. Swanson did not call Mr. Clack, email or text to ask him if he had abandoned the property before Mr. Swanson entered the house on any day in November 2019.

34. If Mr. Swanson thought the property had been abandoned Mr. Swanson could have called his lawyer to ask Mr. Clack's lawyer to ask if Mr. Clack had abandoned the property.

. . . .

38. Mr. Swanson had no right under the deed of trust to enter the property without first getting Mr. Clack's permission.

. . . .

42. When Mr. Swanson arrived on the property on November 17, 2019, Mr. Clack was not present.

11

43. Mr. Swanson took advantage of Mr. Clack not being present on the property on or about November 17, 2019 to have a worker remove and replace at least one lock on a door to the property.

. . . .

47. When Mr. Swanson arrived at the property on November 20, 2019, Mr. Clack was not present.

48. When questioned why you [Swanson] were on the property on or about November 20, 2019, Mr. Swanson told at least one constable that he had evicted Mr. Clack from the property.

49. When questioned why you [Swanson] were on the property on or about November 20, 2019, you told at least one constable that you owned the property.

50. When questioned while you [Clack] were on the property on or about November 20, 2019, Mr. Swanson was unable to show the constable any documentation of eviction, settlement or writ of possession.

51. Mr. Swanson told at least one person who lived near the property that he had evicted Mr. Clack.

. . . .

53. Mr. Swanson could not have truthfully told anyone in November 2019 that he had evicted Mr. Clack from the property.

54. Mr. Swanson removed personal property from the house in November 2019.

55. Mr. Swanson still has some of the personal property that was taken from the house in November 2019.

56. Mr. Swanson sold or gave away some of the personal property that was taken from the house in November 2019.

57. Mr. Swanson knows who besides Mr. Clack has some of the personal property that was taken from the house in November 2019.

58. At least one person [was] working with Mr. Swanson or for him or on his behalf to remove personal property from the house in November 2019.

59. At least one person working with Mr. Swanson or for him or on his behalf removed personal property from the house on November 2019 and put it at the curb to be picked up as trash.

60. Mr. Swanson disabled the video security system in the house in November 2019.

. . . .

62. Mr. Swanson cut at least one of the cables in the house's video security system in November 2019.

. . . .

65. Even after speaking to the constable and being told that this was a civil matter and he should act through his attorney, Mr. Swanson still went back to the property on November 21, 2019, and again entered the house.

66. You [Swanson] know how the car [the 1999 Pontiac TransAm that was in the garage at the house in November 2019] was removed from the garage in the house in November 2019.

67. Mr. Swanson saw the car being removed from the garage in the house in November 2019.

68. Mr. Swanson knows where the car was taken on the date it was removed from the garage to the house.

## B. Clack's Testimony

Clack testified about the circumstances that led to his purchase of the house and the events of November 2019. He said that he had access and control over the house until he turned it over to Swanson in December 2019. He said that, by November 2019, about 90% of his remaining belongings were packed in boxes, except what was in the garage.

The vast majority of Clack's testimony centered on his missing personal property. Clack testified that he asked Swanson to return the property to him more than a dozen times. He identified and described the items he claims went missing from his house, and he estimated their value. At trial, he was asked about each of the items he reported missing to the constable. That list included his estimates of the value of each missing item or group of items. Clack testified that some of his estimates were based on his memory of the purchase price, and for others, he "looked on eBay and just tried to reference what it would cost for replacement." His counsel repeatedly asked him, based on experience and research, to estimate the fair market value or how much money he could have obtained if he had sold the items in 2019, at the time of the conversion. Throughout his testimony, Clack repeatedly stated that he was not trying to sell any of his possessions in 2019, and that nearly all the property he reported missing was still in working condition. Although he repeatedly expressed uncertainty about the fair market value in 2019,

14

he acknowledged several times that used personal property would be worth less than the original purchase price.

Clack's missing possessions can be grouped into (1) personal and household items, (2) sports and hobby items, (3) items related to his air conditioning repair business, (4) items related to a contract work project he did in 2018, and (5) items related to his custom t-shirt business.

### 1. Personal and Household Items

Clack testified that the following personal and household items were missing from his house after he encountered Swanson there without permission: (1) a king-sized bed set; (2) a leather couch and love seat; (3) an LG brand four-door refrigerator; (4) two LG brand flat screen televisions, 49" and 55"; (5) numerous kitchen items; (6) a security camera system; (7) a propane grill and two propane tanks; (8) a Berkel 808 commercial meat slicer; and (9) a Craftsman platinum push mower; and (10) two Craftsman weed trimmers.[7]

Clack testified that he bought the king bed set for $2,500 in 2016, without the mattress. His attorney asked for his "understanding as to what you think you could have sold that for or if you had to buy a used bed like that what you would

---

[7]  Clack also testified that the following items were missing: a Bissell carpet cleaner; a Bose surround sound system; a television stand; wall décor; pillows and blankets; miscellaneous car and motorcycle parts and accessories; miscellaneous rakes, hoes, and axes; and two containers of pool chemicals. The jury found that these items had zero value. Because Clack does not challenge these findings in his cross-appeal, we do not discuss them.

15

have bought it for?" Clack said, "1750 . . . 1500, depends. I wasn't trying to sell any of my stuff." Clack said that he bought the leather couch and love seat for $3,000 at the same time he bought the king bed set. He did not recall the brand. When asked what he believed "the fair market value would have been" for the couch and loveseat "about three years" after he purchased it, Clack said: "It's hard to say, you know, 2,000, 2,500. It's you know, really hard to say what this stuff is valued at." Clack said he bought the refrigerator from Sears for $2,000 in 2017 or 2018 just after he moved in. Clack testified that he did not look for similar items on eBay or online to determine a cost. Asked about the fair market value, he said, "I had just bought it. Refrigerator is, I don't know, 2,000." Clack testified that he bought the televisions at Walmart in 2016 or 2017 for "roughly 1300 bucks probably for two of them," and he agreed their value would decrease over time. He said the fair market value for both televisions was "[p]robably 50 bucks." He added, "I mean, TVs depreciate like crazy."

Clack was unsure about "what all was taken" from his kitchen. He testified that he lost: "Silverware, glasses, plates, bakeware. I like cast iron skillets. There were some cast iron skillets gone. You know, just numerous things. A blender. It was hard to say because like I said I was still in the process of moving and not taking stuff and so that's . . . it's hard to say what all was taken." His attorney asked what value he assigned to the lost kitchen items, and Clack testified: "It was

hard to say. I just put $1,000. . . . I mean, there's not really . . . I mean, how can you put a value on something like that." He said he probably spent "a lot more than $1,000" to replace the items.

Clack testified that he bought the security system when he moved into the house in 2017 for $1,200, and he testified that he believed the value in November 2019 was $1,200. He said: "Once again, it's hard to say because who buys use[d] security equipment? You know, I would say 1200 bucks, that's what I paid for it."

Clack testified that the propane grill was new. He bought it for $475 in October 2019 and put it together because he intended to give it as a gift. He testified that the propane gas tanks are exchangeable or refillable for $20 each, but they cost $45 or $55 each if purchased new. He testified that he bought them for $45 each, but he did not say when he bought them, and he did not know whether they were empty.

Clack did not remember when he bought the Berkel 808 meat slicer, but he thought it was approximately eight years old. He testified that he was "an avid hunter" and that he makes his own sausage and cures his own meats. He testified that he replaced the blade about 18 months before the alleged conversion and that the blade alone cost $800. Clack testified that he lost a Craftsman Platinum push mower, which he bought in 2015 or 2016 for "probably around 350." His lawyer asked: "So being a few years old, did you ever develop an understanding as to

17

what the also fair market value would be?" Clack responded: "Once again, it's hard to say. I'd say maybe 5- to 200 bucks." Clack testified that he bought the two Craftsman weed trimmers around 2016 for around $350 to $400, saying: "It's hard to say. I can't remember." He testified that the fair market value for these weed trimmers was: "150 bucks, you know, 200 bucks. Once again, it's one of those things that's hard to say what price that somebody would give you for something in back in 2019."

### 2. Sports and Hobby Items

Clack testified that the following sports and hobby items were missing from his house after he encountered Swanson there without permission: (1) a 1999 Pontiac Trans Am used for amateur off-road drag racing; (2) a 24-foot gooseneck trailer for transporting the Trans Am; (3) a 5-ton cherry picker for automotive work; (4) two hunting bows; (5) seven fishing rods and reels; and (6) a fishing box.

Clack testified that he bought the Trans Am in 2001 or 2002 for around $30,000. He was the second owner. He last saw the Trans Am about a week before November 17, 2019. Between 2005 and 2017, he purchased the Trans Am, he customized it for use in the hobby of drag racing at a cost of $38,000, not including his own time and labor. He testified that he replaced the motor with 427 cubic small block motor, replaced the transmission, added new gears, a short throat shifter, nitrous, a roll cage, custom exhaust, and racing wheels. He said that

18

although he was not trying to sell it in November 2019, he believed he could "easily get $35,000" for it.

Clack said that he bought the 24-foot gooseneck heavy duty trailer in 2019. He said:

> The trailer was worth more than what I paid for it. I paid, I think 85-9500 for and I could probably get anywhere from 12- to 15,000 for it is what it was valued and that's my guesstimation. . . . I think the guy was asking for 15 for the trailer. . . . The person I bought it from was asking 15 for the trailer . . . 14,5 or 15 for the trailer.

Clack described the cherry picker as equipment used to remove a motor from a car. He did not recall the brand of his cherry picker. He said it was a few years old, and he thought he paid "around $500 for it." He testified that although it was used, it was in good working condition. He testified that the fair market value for the cherry picker was "3- or 400 bucks."

Clack testified that the missing bows were compound hunting bows. He said: "Those bows were my dad and mine when I was growing up. My dad's bow and then my first bow with my dad. My dad passed in '92 and I don't have much from my dad but that was another priceless item." Although he testified that he would not have sold them for any amount of money, he said that he would "put a value of 500 bucks on them" based on his lifelong knowledge of archery and hunting.

Clack testified that he had fishing rods for bass fishing and cat fishing. He believed that he had seven fishing rods, but he said that he did not really remember how many he had. He said that they were all in working condition though they ranged in age from a couple of years old to up to 15 years old. He agreed that he could "look online to figure out the price of similar fishing rods and reels," and he testified that he "put 300 bucks" for the loss of the fishing rods and reels.

Clack testified that he lost a five- or six-year-old Plano fishing box full of lures for bass fishing as well as hooks, worms, stringers, and pliers. He estimated the value of the fishing box was "probably about 150 bucks." He said that he had replaced some but not all the lost fishing items, and he noted that he spent $200 to replace a single fishing rod.

### 3.    Items Related to Clack's Air Conditioning Repair Business

Clack testified that the following items relating to his air conditioning repair business were missing from his house after he encountered Swanson there without permission: (1) a Husqvarna weed trimmer; (3) a Husqvarna chainsaw; (4) a wheelbarrow; (5) six trash bins; (6) Dewalt cordless power tools; (7) extension cords, 50- and 100-feet; (8) six bottles of R22 refrigerant; and (9) 12 bottles of R410A refrigerant.

Clack testified that he used the Husqvarna weed trimmer for work, to trim the grass around the air conditioning unit when necessary. Clack said it was older

20

but gave no specifics. He testified that he paid $260 for it originally. He believed that the fair market value for it in November 2019 was "150, 200 bucks." Clack testified that he used the Husqvarna chainsaw for cutting trees. He believed that he bought it in December 2018 for $400. When asked about the fair market value, he said: "Probably anywhere from 200 to 300 bucks."

Clack testified that he lost a commercial wheelbarrow that he used for work. Clack did not recall how old the wheelbarrow was, but he said it was in good working condition, and he estimated the fair market value would be $50 or $75. Clack testified that he used six trash bins to segregate waste, like freon bottles, and other items of scrap metal. He testified that they were two or three years old and that he spent about $480 on all of them. As to the fair market value of the trash bins in 2019, he said: "Couple hundred bucks, 300 bucks. I don't know."

Clack testified that he lost Dewalt cordless power tools, which ranged in age from one to ten years. He said: "There was regular drills and impacts. . . . And there were sheers. And the sheers when you're working on air-conditioning it cuts a straight line in the metal, so there were electric sheers." As to the November 2019 fair market value, Clack testified: "I probably had 3- or $4,000 worth of Dewalt tools." He acknowledged, however that he had reported $500 for the value of the Dewalt power tools in the police report, but he testified that it was "a typo"

21

and that it should have been $5,000 not $500. He said one impact drill "was probably $450 bucks."

Clack testified that the extension cords were commercial grade and suitable for use with the power tools he needed for his air conditioning repair work. He said he bought them from Home Depot, and while he did not remember when he bought them, he testified that it was "probably within a couple of years." He said, "[I]t's hard to say because, you know, tools go bad and you throw some tools away and then you buy tools and it's really hard to keep up with what you have. If you don't have a standing inventory of what you had, I mean, it's really difficult to say." He testified that he "probably paid $400" for the extension cords. As to fair market value in November 2019, he testified: "I'd probably get 100 bucks, 200 bucks or 250 bucks for them used."

Clack testified that he lost six bottles of R22 refrigerant for use in air conditioning. Clack explained that production of R22 was discontinued in January 2020 and the cost of freon (R22) varied widely in November 2019. He said: "So at that time there's like a window of opportunity there to make a lot of money. So if I could get a bottle of R22, I think I was paying anywhere from 3- to $500 for a bottle of R22 so I could make on the top end of air conditioning." He also testified that, based on prices from Johnston Supply, a supply shop in Houston with which Clack had a contract, a bottle of R22 sold for $1,428 at the time of trial. But, he

22

also acknowledged that there was none in stock. He said: "They're not producing it anymore. What is out there is out there. You can't get it anymore, it's gone basically extinct." He estimated that the six bottles, which were unopened, were worth between $1,800 and $3,000 based on November 2019 prices.

Clack testified similarly about the twelve bottles of R410A refrigerant, which was a different type of freon. He said that in 2019 he paid no less than $89 a bottle but up to $150 to $200 a bottle. He said that the price per bottle had increased to about $450 at the time of trial, and he estimated that the fair market value of the R410A refrigerant in November 2019 was about $1,800 based on 12 bottles at $150 each.

### 4.    Items Related to 2018 Contract Work Project

Clack testified that the following items relating to a 2018 contract work project were missing from his house after he encountered Swanson there without permission: (1) a Craftsman router table; (2) router bits; (3) a Dewalt planer; (4) a Porter cable router; (5) sawhorses; (6) saws, (7) Kreg jigs; and (8) Craftsman toolboxes full of tools.

Clack testified about several pieces of equipment and tools that he used for a contract project for a customer in 2018. He testified that he paid $320 for a router table in 2018, and that the fair market value for that in November 2019 was "couple hundred bucks." He testified about three or four sets of different types of

23

router bits. He said that he paid "a couple hundred bucks" for the 150-piece set of router bits. As to a 50-piece set, he was asked, "based on your research and understanding and what you recall what your understanding was in terms of the fair market value was for those back in November 2019?" Clack testified: "Those were 3- or 400 bucks. They were pretty expensive." He bought the Dewalt planer for $450 or $500, and he testified that its fair market value in November 2019 was "probably 400 bucks." He testified that he thought he paid $350 for the Porter router and that its fair market value in November 2019 was $250 or $300. He said he lost three sets of sawhorses that he bought new for $75 for each set, and he estimated the fair market value of each set would have been about $20 in November 2019. He testified that he lost Skil saws, jigsaws, and reciprocating saws. He said he bought them "throughout the year," and that "[t]hey are probably a couple hundred bucks each new. So probably paid new for them probably 800 to 1,000 bucks." He testified that the fair market value of these saws in November 2019 was "3- or 400 bucks."

Clack testified that he paid around $300 for a couple sets of Kreg jigs in 2018 when he bought the router and the table. He said that fair market value for those Kreg jigs was "couple hundred bucks."

Finally, Clack testified that he lost three Craftsman toolboxes full of tools, many of which he had collected over the years, some in conjunction with working

on the Trans Am. He also testified that he had a newer set of Craftsman deep socket sets from Sears, and a couple of Snap-on sets that were worth "probably $800." When asked for a fair market value for November 2019, he said: "[Y]ou know, I'll put $1,000 on it because, you know, it's unknown. You know, I don't know. I can't even tell you exactly what all I had in the toolboxes." He said he had not replaced everything but added: "I'll spend over $1,000 usually on some of this stuff. I bought a Craftsman toolbox and I think the toobox was 300 bucks for one of the toolboxes that I replaced with."

### 5.    Items Related to Custom T-Shirt Business

Clack testified that the following items relating to his custom t-shirt business were missing from his house after he encountered Swanson there without permission: (1) a Ricoh printer; (2) an HP Photosmart Pro large format printer; (3) Vinyl Express Qe6000 vinyl cutter; (4) Endura Press 15 by 15 heat press; and (5) hundreds of shirts, vinyl, and printing supplies.

Clack testified that he bought the Ricoh sublimate printer in 2018 for $1,450. He testified that his understanding of the fair market value in November 2019 was $800 or $900. He testified that probably bought the HP Photosmart printer before 2017 because he had it before he moved into the house. He thought he paid $2,000 for it, and as to fair market value in November 2019, he said:

"1,000 bucks, 750 bucks, 1,000 bucks. Once again, all this stuff is really hard to say what anybody would go for it."

Clack testified that he used the vinyl cutter to make decals for his custom t-shirt business. He purchased it in 2015 for $1,600. He testified that its fair market value in November 2019 was $800 or $1,000. Clack testified that he also used the Endura Press in his custom t-shirt business. He said he bought it for around $500 in "probably 2015." He said that its fair market value in November 2019 was "2- or $300, I guess." He also said that both the press and the vinyl cutter were in good working condition. Finally he estimated that he lost about $3,500 worth of t-shirts, vinyl, and rhinestones that he used in his custom t-shirt business.

## C. Swanson's Testimony

Swanson testified that he was at Clack's house several times: once before the incident with Clack, once when he encountered Clack, and again several days later. Based on conversations with Clack's neighbors and his observations of the external utility meter, Swanson believed that Clack had abandoned the house. The first time he went to the house, which was some time in November 2019, he called the constable to walk through with him to confirm that the house was abandoned. Swanson said he did not recall the constable telling him not to do anything with the personal property left at the house. Swanson also recalled one time in November

2019 when Clack was also present at the house. Swanson testified that he did not recall Swanson saying that his property was missing.

Swanson described the house as a mess and an obstacle course. He recalled the presence of hangers, a metal bed frame, several boxes, and other items that he believed were unwanted. He also testified about seeing miscellaneous car parts and tires in the garage. Swanson testified that he cleaned out the house, but he maintained that the items in the house were garbage, which he put to the curb, took home to his burn pile, or took to the scrap metal yard. Swanson testified that he saw a few boxes in the house but that there was no car there at any time. He said he put "a lot of the stuff out at the curb," and that Clack picked it up and took it.

Swanson testified that, after their encounter in November 2019, he gave Clack several days to clear out the house and garage, and when he returned again, he saw that Clack had removed nearly everything else that had remained in the house and garage.

Swanson testified that he did not see any of the items that Clack described as missing when he was at Clack's house. When asked if he recalled that "for sure," he said, "yes." Swanson testified that he took pictures of all the rooms, he looked at them frequently, and he believed that Clack "made it up" and "it's well exaggerated." Swanson testified that he did not know where the Trans Am or

27

Clack's hunting bows were and that he did not do anything with them. He said he never saw the car at the house.

Swanson recalled the 2018 foreclosure, but he said he did not personally attend the auction. Swanson testified that he personally sent Clack a certified letter informing him of the foreclosure sale.

Swanson did not recall attending the hearing on his eviction suit, nor did he remember the order dismissing the eviction suit. Swanson said he did not remember that the court did not approve the eviction of Clack, nor did he remember whether a court gave him permission to evict Clack in April 2018. Swanson testified however, that sometime before the end of 2021, he developed a belief that he had a court order allowing him to evict Clack. When asked if he remembered filing the suit for declaratory judgment, Swanson replied: "This was four years ago. I'm having dementia to say the least, I'm suffering from here in the last year, year and a half."

### D. Attorney's Fees Testimony

Clack's attorney, Ira Joffe, testified on attorney's fees. He described his experience and education, the specifics of the work that he did regarding Swanson's declaratory judgment claim and why the case lingered for four years, reviewed his billing records, and explained his billable rate and why it was reasonable for his experience and the locale. He said that he spent 215 hours on

28

legal work relating to the wrongful foreclosure and defending Clack against Swanson's claims, based on a tally of his billable hour records from the date he began representing Clack until May 27, 2020, when the trial court granted the summary declaratory judgment that the foreclosure was void. Joffe testified that his billable rate was $500 per hour and the total attorney's fees he sought for 215 hours at $500 per hour was $107,500. He also testified that this amount was fair and reasonable.

Nitin Sud, who also represented Clack at trial, testified about conditional appellate attorney's fees, explaining the work required for each stage of appeal, and estimating the time required to complete the work for each phase.

### E.    Charge Conference

After the parties rested, the trial court held a charge conference, at which Swanson's attorney stated that he had no objections. He also did not proffer any jury questions, instructions, or definitions.

## VII.  Jury Verdict and Post Judgment Motions

The jury returned a verdict in favor Clack, answering "yes" to Question Number 3, which asked, "Did Mr. Swanson convert any of Mr. Clack's property?" The jury found the amounts that would fairly and reasonably compensate Clack for his damages that resulted from the loss of his belongings. These amounts totaled $57,400. The jury found by clear and convincing evidence that Swanson acted with

malice. The jury awarded $200,000 in exemplary damages. The jury found $96,750 in trial attorney's fees for contesting the validity of the disputed foreclosure and proving it was defective. The jury also found conditional appellate attorney's fees.

Swanson filed multiple motions for judgment notwithstanding the verdict and for a new trial, contesting the jury's verdict. After a hearing, the trial court reduced the actual damages found by the jury for the Trans Am from $35,000 to $30,000, and for the 24-foot gooseneck trailer from $10,000 to $8,500. The trial court entered judgment on the verdict as modified.

Both Swanson and Clack appealed.

## Analysis

On appeal, Swanson raises nine issues. The first three issues challenge the trial court's award of damages on Clack's conversion claim, issues four through seven challenge the award of attorney's fees, and issues eight and nine challenge the award of exemplary damages. In his cross appeal, Clack challenges the trial court's reduction of compensatory damages for conversion (issues one and two) and reduction of exemplary damages (issue three).

## I.      Conversion

Swanson's first three issues and Clack's first two issues challenge the trial court's judgment for "past economic damages" from Swanson's conversion of Clack's property.

Swanson argues that there was no jury finding that he converted the property listed in Question No. 1, and therefore the judgment was not supported by the verdict. He also argues that the evidence was legally and factually insufficient to support a judgment for conversion, and to support the damages awarded for the conversion. In the first two issues in his cross-appeal, Clack challenges the trial court's reduction of the jury's damages award for the trailer and the Trans Am.

### A.      The Property in Question No. 1

In his second issue, Swanson argues that the jury's affirmative answer that he converted "any" of Clack's property did not support a judgment that he converted the specific items of property listed in the Question No. 1. He also argues that Question No. 3 was immaterial because it did not connect the finding of conversion with the property in Question No. 1. In his third issue, he argues that the evidence is legally and factually insufficient to support a conclusion that he converted the specific property listed in Question No.1.

A trial court's judgment must conform "to the pleadings, the nature of the case proved and the verdict, if any, and shall be so framed as to give the party all

31

the relief to which he may be entitled either in law or equity." TEX. R. CIV. P. 301. Rule 301 also authorizes a trial court to grant a judgment notwithstanding the verdict "if a directed verdict would have been proper," and to disregard a jury finding that is not supported by the record. *Id.* "The judgment must also be framed so as to give all the relief to which the prevailing parties are entitled in law or equity." *Salomon v. Lesay*, 369 S.W.3d 540, 553 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

We review de novo the question whether the trial court complied with Texas Rule of Civil Procedure 301. *R3Build Constr. Servs., LLC v. Drayden*, No. 01-20-00144-CV, 2022 WL 3452436, at *10 (Tex. App.—Houston [1st Dist.] Aug. 18, 2022, no pet.) (mem. op.). *Cf. Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) (stating that application of law to undisputed facts is reviewed de novo). In addition to conforming to the pleadings, the judgment must also reflect a correct application of the law to determine the effect of the jury's verdict. *Salomon*, 369 S.W.3d at 554. *Cf. Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) ("A trial court has no 'discretion' in determining what the law is or applying the law to the facts.").

We construe Swanson's second issue as an assertion that the judgment did not conform to the jury's verdict, which he maintains does not find that he converted the specific property listed in Question No. 1.

The jury charge asked:

## QUESTION NUMBER 1

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mr. Clack for his damages that resulted from the loss of his property for each of the following items?

This question was followed by a list of 75 items or groups of items of personal property and blanks next to each on which the jury could write a sum of money.

Question No. 2 pertained to Clack's attorney's fees, and Question No. 3 was the conversion liability question:

## QUESTION NUMBER 3

Did Mr. Swanson convert any of Mr. Clack's property?

Converting property means the taking of someone else's property without permission and refusing to return it. Conversion occurs when:

(1)   the person who had their property taken, either owned or had legal possession of, or was entitled to possession of that property;

(2)   the person who took it did so unlawfully and without authorization and assumed and exercised control over the property, to the exclusion of and inconsistent with the first person's rights; and

(3)   the person who took the property refused to return the property.

Answer "Yes" or "No."

Answer: _____

33

Question No. 1, damages, was not expressly conditioned on an affirmative answer to Question No. 3, conversion. But considering the pleadings, evidence, and verdict, we conclude that the jury found Swanson converted the items for which it assigned values in response to Question No. 1. First, Question No. 3 asked whether Swanson converted any of Clack's property, and the jury found that he did. Second, Question No. 1 asked what amount of money would compensate Clack for his damages that *resulted from* the loss of his property. Clack pleaded that Swanson took items from his house after entering it without legal authorization, and Swanson admitted cleaning out the house. Although the parties disputed the amount, type, and condition of the property Swanson removed from Clack's house, Clack's loss of property was only ever attributed to Swanson's alleged conversion in both his pleadings and the evidence presented at trial. Thus, a proper understanding of Question No. 1 is that it asked the jury to determine damages resulting from Swanson's conversion of Clack's personal items as found in Question No. 3. *See* TEX. R. CIV. P. 301 (judgment must conform to pleadings, nature of case proved, and verdict).

The jury found that some of the property listed in Question No. 1 had a value of zero, and, on appeal, Swanson argues that it was therefore possible the jury believed that Swanson converted only the 18 items for which it assigned a value of zero when it answered Question No. 3 in the affirmative. We disagree.

34

The damages question in Question No. 1 included the "resulted from" language. And based on the pleadings and the evidence, the jury could only have found that Clack's loss resulted from Swanson's conversion because no other loss theory was presented to the jury. Thus, the jury's finding of zero value for some of the items listed in Question No. 1 could only have meant that the jury believed the items were converted but had no monetary value or that the items were not converted at all.

We conclude that the jury's answers to Questions No. 1 and No. 3 together comprise a finding that Swanson converted the property listed in Question No. 1.

We overrule Swanson's second issue.

## B.    Sufficiency of the Evidence

In his second issue, Swanson argues that there was no jury finding that he converted the property in Question No. 1. Having concluded that there was such a finding, we turn to his third issue. Swanson asserts that the evidence was legally and factually insufficient to support the jury's finding that he converted the property identified in Question No. 1. In addition, he argues, in his first issue, that the evidence is legally and factually insufficient to support the damages found by the jury in Question No. 1.

35

## 1. Standards of Review

**Legal sufficiency.** The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When conducting a legal sufficiency review, we "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 807; *see also Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006). So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the factfinder. *City of Keller*, 168 S.W.3d at 822.

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Kroger Tex.*, 216 S.W.3d at 793 (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citation omitted)).

**Factual sufficiency.** In a factual-sufficiency review, we set aside a finding only if, after considering and weighing all the pertinent record evidence, we determine "that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the [finding] should be set aside and a new trial ordered." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016). When conducting a factual-sufficiency review, a court of appeals must not merely substitute its judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

**Role of factfinder.** For both legal and factual sufficiency analyses, we remain cognizant that jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony, and they may choose to believe one witness and to disbelieve another. *City of Keller*, 168 S.W.3d at 819; *Golden Eagle Archery*, 116 S.W.3d at 761.

### 2. Evidentiary Sufficiency for Swanson's Conversion of Clack's Property

We have already concluded that the jury's answers to Question No. 3 and Question No. 1, together, comprise a finding that Swanson converted the property listed in Question No. 1. We now consider whether the evidence supports a finding that Swanson converted the property listed in Question No. 1.

*Conversion*. "Conversion is the wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or

37

inconsistent with, the owner's rights." *Burns v. Rochon*, 190 S.W.3d 263, 267–68 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Waisath v. Lack's Stores, Inc.,* 474 S.W.2d 444, 447 (Tex. 1971)). "To establish a claim for conversion, a plaintiff must prove that (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property." *Burns*, 190 S.W.3d at 268.

*Element 1: Lawful Ownership or Possession.* Clack testified in detail about the personal property that remained in his house in November 2019. He testified that, due to ongoing friction with Swanson, he had already begun to move his belongings to another home, but he had not finished moving. He testified that he had boxed up most of his belongings, and he testified about which items remained. Clack testified that he worked for himself doing air conditioning repair and, as a sideline, making custom t-shirts. He described in some detail the property that remained at the house or in the garage relevant to both businesses. He also described other property, including items used for sports and hobbies, in particular, his 1999 Trans Am, which he had customized for amateur, off-road drag racing.

Swanson testified that the property remaining in the house in November 2019 was of poor quality and basically "garbage." He testified that he did not see or recall the majority of the property that Clack testified was there before Swanson cleaned out the house. But it was uncontested that the property in the house– whatever it was–lawfully belonged only to Clack.

The evidence is legally and factually sufficient to support the first element of conversion. *See Crosstex*, 505 S.W.3d at 615 (factual sufficiency); *City of Keller*, 168 S.W.3d at 827 (legal sufficiency).

***Element 2: Unlawful Exercise of Control.*** The second element of conversion is supported by Swanson's deemed admissions, which showed that Swanson sold the house to Clack on August 22, 2017. The deemed admissions also showed that Swanson did not obtain an eviction order from the court, and his suit was dismissed. The deemed admissions established that Swanson entered Clack's house despite knowing that (1) he had no right to enter without Clack's permission, (2) he had no court order allowing him to enter the house, and (3) the constable had advised him to pursue a civil, legal remedy. The deemed admissions established that Swanson did not ask Clack if he had abandoned the property. And finally, the deemed admissions established that Swanson or his employees removed personal property from Clack's house.

The evidence is legally and factually sufficient to support the second element of conversion. *See Crosstex*, 505 S.W.3d at 615 (factual sufficiency); *City of Keller*, 168 S.W.3d at 827 (legal sufficiency).

***Elements 3 & 4: Demand and Refusal.*** Clack testified that he demanded return of his property multiple times and in more than one way. Clack said that Swanson never returned any of his property. In addition, at trial, Swanson said that he was not able to return any property to Clack. The evidence is legally and factually sufficient to support the third and fourth elements of conversion. *See Crosstex*, 505 S.W.3d at 615 (factual sufficiency); *City of Keller*, 168 S.W.3d at 827 (legal sufficiency).

***The Property in Question No. 1.*** Clack testified about each item listed in Question No. 1. While the amount of detail varied somewhat as to each item of property, every item was mentioned. Swanson's testimony that certain items, like the car, were not at the house, or that he did not recall seeing certain items at the house presented the kind of inconsistency that the jury alone may resolve. *See City of Keller*, 168 S.W.3d at 819; *Golden Eagle Archery*, 116 S.W.3d at 761. And, the jury could have weighed the deemed admissions regarding Swanson's knowing misrepresentations to law enforcement, and Swanson's testimony about his faulty memory and dementia against his credibility. *See City of Keller*, 168 S.W.3d at 819; *Golden Eagle Archery*, 116 S.W.3d at 761.

40

**Conclusion.** Based on the testimony and deemed admissions, and viewing the evidence in the light favorable to the verdict, we conclude that reasonable and fair-minded jurors could have concluded that Swanson converted the items listed in Question No. 1 for which it assigned a value. *See City of Keller*, 168 S.W.3d at 819; *Golden Eagle Archery*, 116 S.W.3d at 761. Accordingly, we hold that the evidence is legally sufficient to support the jury verdict. *See City of Keller*, 168 S.W.3d at 827 (legal sufficiency). Similarly, having considered and weighed all the evidence, we conclude that the credible evidence supporting the jury's verdict is not so weak or contrary to the overwhelming weight of the evidence that the verdict should be set aside in favor of a new trial. *See Crosstex*, 505 S.W.3d at 615.

We overrule Swanson's third issue.

### 3.     Sufficiency of the Evidence to Support Damages

In his first issue, Swanson argues that the evidence was legally and factually insufficient to support the jury's findings on the value of Clack's personal property. Swanson's argument focuses on the need for sufficient evidence of fair market value as a measure of damages for conversion.

Generally, the measure of damages for conversion is the fair market value of the property at the time and place of the conversion. *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147–48 (Tex. 1997); *Burns*, 190 S.W.3d at 270. "Fair market value has been defined as 'the price which the property would bring when

41

it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it.'" *Burns*, 190 S.W.3d at 270 (quoting *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808, 815 (1954)). "However, when converted property has no readily ascertainable fair market value, the measure of damages is the actual value of the property to the owner at the time of its loss." *Burns*, 190 S.W.3d at 270 (citing *Crisp v. Sec. Nat'l Ins. Co.*, 369 S.W.2d 326 (Tex. 1963)). "In determining both fair market value and actual value, courts have considered the purchase price paid by an owner, particularly when evidence of the purchase price is neither objected to nor controverted." *Id.* "To establish conversion damages, the original cost in the market, and the manner, time, and place of use, the condition of the property and the relative usefulness before and after the alleged injury may be offered into evidence." *Wise v. SR Dallas, LLC*, 436 S.W.3d 402, 412 (Tex. App.—Dallas 2014, no pet.) (citing *Henson v. Reddin,* 358 S.W.3d 428, 436 (Tex. App.—Fort Worth 2012, no pet.)). While testimony regarding purchase price, standing alone, will not support a fair-market-value damages award, it is a starting point for actual damages from which "adjustments are made for wear and tear, depreciation, and other pertinent factors." *Id.* at 413.

Regardless of the measure of damages, the property owner may testify about the value of his property. *Burns*, 190 S.W.3d at 271; *see Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012) (considering real property

42

owner's testimony regarding value of land). However, when a property owner purports to testify about market value, it must meet the same standards as other opinion evidence. *See Justiss*, 397 S.W.3d at 156; *see also* TEX. R. EVID. 701 (allowing lay witness to provide opinion testimony when it is rationally based on witness's perception and helpful to clear understanding of witness testimony or determination of fact in issue). When a property owner gives lay opinion testimony about the market value, it must be based on more than the property owner's *ipse dixit*. *See Justiss*, 397 S.W.3d at 156. "[T]he valuation must be substantiated; a naked assertion of 'market value' is not enough." *Id.* at 159 (holding in nuisance case that property owner's opinion of fair market value of real property must be supported by "[e]vidence of price paid, nearby sales, tax valuations, appraisals, online resources, and any other relevant factors"). Even unchallenged testimony "must support a verdict, and conclusory or speculative statements do not" support a verdict for damages based on fair market value. *Id.*

Clack relies on *Burns*, arguing that because there was no controverting evidence, his testimony is legally and factually sufficient to support the jury's verdict regarding the value of his personal property. Swanson argues that *Justiss* implicitly overruled *Burns*, and he urges us to overrule it.

We need not resolve the issue in this case because the parties did not submit "fair market value" as the sole measure of damages in the jury charge. Swanson

43

did not object to the submission of Question No. 1 on damages, nor did he proffer a request for an instruction or definition regarding "fair market value." When, as here, the parties do not object at trial to the substance of the law set forth in the jury charge, we review the sufficiency of the evidence in light of the legal standards contained in the unobjected-to charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.").

The court's charge asked in Question No.1: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mr. Clack for his damages that resulted from the loss of his property for each of the following items?" There were no instructions about what measure of damages the jury should consider. We construe this, therefore, as a question that broadly asked the jury to consider fair and reasonable damages for the conversion, not the fair market value of the items.

At trial, Clack was repeatedly asked to estimate the fair market value of each of the items that Swanson converted. Clack did more than simply state a value. His testimony included information such as (1) descriptions of the items, including brand names and special features, (2) how he used the items for personal or professional purposes, (3) the age and condition of the items, (4) the purchase

44

price, (5) improvements made to the items, (6) estimates of resale value, (7) estimates of replacement value, and (8) his estimates of depreciation. Clack's testimony about the value of his converted personal property was not objected to or controverted. We conclude that the evidence was sufficient to allow the jury to determine an amount of money that would fairly and reasonably compensate Clack for his conversion damages for each item or group of items. *See Burns*, 190 S.W.3d at 270; *Wise*, 436 at 412. We conclude that the evidence at trial would enable reasonable and fair-minded people to find Clack's damages as found by the jury in response to Question No. 1. *See City of Keller*, 168 S.W.3d at 827. Further, we conclude that the credible evidence supporting the jury's answer to Question No. 1 is not so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *See Crosstex*, 505 S.W.3d at 615. We hold that the evidence was legally and factually sufficient to support the jury's assessment of damages. *See Crosstex*, 505 S.W.3d at 615 (factual sufficiency); *City of Keller*, 168 S.W.3d at 827 (legal sufficiency). We overrule Swanson's first issue.

### 4. Trial Court's Reduction of Value of Trans Am and Trailer

Having concluded that the jury's verdict was supported by legally and factually sufficient evidence, we now consider Clack's first two cross-issues, in

which he challenges the trial court's reduction of the value of his Trans Am and the 24-foot gooseneck trailer.

After trial, Swanson filed motions for judgment notwithstanding the verdict and for new trial, challenging the evidentiary support for the jury's verdict. At the hearing on Swanson's motions, the trial court expressed its opinion that Clack's testimony lacked credibility, saying: "[M]y biggest beef here is this trailer and this Trans Am. I mean, these are just sort of made up whole cloth numbers, right, the 35 and the 10." We disagree with this characterization. Clack testified about the purchase price of the car, its age, its use, the improvements he made, and its specialized nature as an off-road drag racing vehicle. Clack also testified that he bought the trailer in 2019, and he testified about the negotiations when he purchased it. Because he purchased it close in time to the date of conversion, the jury could have reasonably considered Clack's testimony about the purchase price and negotiations as some evidence of the value of the trailer. In addition, the jury could have also relied on Clack's testimony that he used the trailer to transport the Trans Am, and it could have concluded that the trailer was in working order.

We have already concluded that the evidence, though indefinite at times, was legally and factually sufficient to support the jury's damages awards in light of the question submitted. "A trial court may disregard a jury finding only if it is unsupported by evidence . . . or if the issue is immaterial." *USAA Tex. Lloyds Co.*

46

*v. Menchaca*, 545 S.W.3d 479, 505 (Tex. 2018) (quoting *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) (citing *C. & R. Transp., Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966))). Here, the jury's answers to Question No. 1 were supported by the evidence and material to Clack's damages for conversion. We conclude that the trial court erred by disregarding the jury's answers to Question No. 1, in part, and reducing the damages awarded for conversion of the Trans Am and the trailer. *See Menchaca*, 545 S.W.3d at 505.

We sustain Clack's first two cross-issues. We modify the judgment of the trial court to award Clack the amount of $57,370 in compensatory damages, and we affirm as modified.[8]

## II.    Exemplary Damages

In his eighth and ninth issues, Swanson challenges the award of exemplary damages. First, Swanson asserts that the judgment for exemplary damages was not supported by legally and factually sufficient evidence. In his ninth issue, Swanson challenges the exemplary damages award. He argues that: (1) the award of exemplary damages was improper because the evidence is insufficient to support Clack's conversion claim; (2) the evidence is legally and factually insufficient to support the award of exemplary damages; and (3) the exemplary damages award is

---

[8]    In the trial court, Clack requested $30 less than the amount awarded by the jury in recognition that the jury awarded $50 for the sawhorses despite his testimony that they were worth only $20.

unconstitutionally excessive. In his third cross-issue, Clack argues that the trial court erred by applying a factor and reducing the award of exemplary damages.

### A.      Legal Standards

"Exemplary damages" are "any damages awarded as a penalty or by way of punishment but not for compensatory purposes." TEX. CIV. PRAC. & REM. CODE § 41.001(5). "Exemplary damages are neither economic nor noneconomic damages." *Id.* To support an award of exemplary damages, the plaintiff must prove a distinct tortious injury with actual damages arising from that injury. *See Tex. Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex. 1986). Exemplary damages are an element of damages; "there is no independent cause of action for exemplary damages." *Robbins v. Payne*, 55 S.W.3d 740, 747 (Tex. App.—Amarillo 2001, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE § 41.002).

"[E]xemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." TEX. CIV. PRAC. & REM. CODE § 41.003(a); see *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 866 (Tex. 2017). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM. CODE § 41.001(2). "'Malice' means a

48

specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* § 41.001(7). The plaintiff must prove that the defendant intended for the plaintiff "to suffer substantial injury that was 'independent and qualitatively different' from the compensable harms associated with the underlying causes of action." *Horizon Health*, 520 S.W.3d at 867 (quoting *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 662 (Tex. 2012)). For exemplary damages, a court cannot rely on evidence of the tort itself, with little more, to support a jury's finding of malice. *See id*.

Exemplary damages are limited to the greater of (1) twice the economic damages plus the noneconomic damages found by the jury up to $750,000, or (2) $200,000. *Id*. § 41.008(b).

## B. Exemplary Damages Supported by Conversion Claim

In his restatement of his Issue No. 8, Swanson wrote:

**Issue No. 8 Restated**

**Whether the trial court erred in entering judgment awarding Clack exemplary damages. The award of exemplary damages was not supported by legally or factually sufficient evidence because there was no basis for the Court to enter a judgment on Clack's conversion claim and thus, no basis for a finding of malice. There was also legally and factually insufficient evidence to support a finding of malice and the factors to be considered in awarding exemplary damages. For the same reasons, whether the trial court erred in denying Swanson's Motion for JNOV and Motion for New Trial.**

Swanson's argument that the court erred by entering judgment for exemplary damages because the evidence was legally and factually insufficient to support Clack's conversion cause of action is unavailing. We have already explained that the evidence was legally and factually sufficient to support the jury's verdict that Swanson converted Clack's property and to support the conversion damages found by the jury. We therefore conclude that an award of exemplary damages is supported by a finding of "a distinct tortious injury with actual damages arising from that injury." *See Karnes,* 717 S.W.2d at 903.

To the extent that Swanson is challenging the sufficiency of the evidence to support the jury's finding of malice in Question No. 4, that argument is inadequately briefed. *See* TEX. R. APP. P. 38.1. In his brief, Swanson wrote: "Because the evidence was insufficient to establish the elements of Clack's conversion claim, there could not be any evidence (much less clear and convincing evidence) that Swanson had a specific intent to cause substantial harm or injury to Clack sufficient to establish malice." App. Br. 54. Aside from asserting that Clack's conversion claim was not supported by legally and factually sufficient evidence, Swanson did not explain why the jury's answer to Question No. 4 was not supported by legally and factually sufficient evidence. He also did not provide citations to authority or to the record. *See* TEX. R. APP. P. 38.1(i). We overrule Swanson's eighth issue.

50

## C.    Sufficiency of the Evidence of Exemplary Damages

We construe Swanson's non-constitutional challenge to the excessiveness of the exemplary damages as challenging the legal and factual sufficiency of the evidence to support the award.[9] *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) ("Appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver.").

"[I]n reviewing the legal sufficiency of evidence to support a finding that must be proved by clear and convincing evidence, an appellate court must 'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its

---

[9]    This Court has held that the standard of review for a challenge to the excessiveness of exemplary damages is factual sufficiency. *Huynh v. Phung*, No. 01-04-00267-CV, 2007 WL 495023, at *9 (Tex. App.—Houston [1st Dist.] Feb. 16, 2007, no pet.) (mem. op.) (citing *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998)). However, we have also engaged in a legal sufficiency review of the evidence to support an exemplary damages award when the appellant expressly raised that challenge on appeal. *Supply Pro, Inc. v. Ecosorb Int'l, Inc.*, No. 01-15-00621-CV, 2016 WL 4543136, at *11 (Tex. App.—Houston [1st Dist.] Aug. 30, 2016, pet. denied) (mem. op.) (evaluating appellant's challenge to legal sufficiency of evidence to support exemplary damages award). Several of our sister courts of appeals have also held that the standard of review of a non-constitutional challenge to the sufficiency of exemplary damages is factual sufficiency. *E.g.*, *Turner v. Duggin*, 532 S.W.3d 473, 489 (Tex. App.—Texarkana 2017, no pet.) (quoting *Wilen v. Falkenstein*, 191 S.W.3d 791, 802 (Tex. App.—Fort Worth 2006, pet. denied) (citing *Ellis*, 971 S.W.2d at 406)); *Allstar Refinishing & Collision Ctr., Inc. v. Villalobos*, No. 11-14-00193-CV, 2016 WL 4719062, at *3 (Tex. App.—Eastland July 29, 2016, pet. denied) (mem. op.); *Barnhart v. Morales*, 459 S.W.3d 733, 749 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Baribeau v. Gustafson*, 107 S.W.3d 52, 61 (Tex. App.—San Antonio 2003, pet. denied).

finding was true.'" *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 609 (Tex. 2004) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In doing so, the "reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* at 627 (quoting *J.F.C.*, 96 S.W.3d at 266). "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of evidence to support a finding that must be proved by clear and convincing evidence, a "court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

A party may challenge an award of exemplary damages as excessive. *Sohani v. Sunesara*, No. 01-20-00114-CV, 2023 WL 1112165, at *20 (Tex. App.—Houston [1st Dist.] Jan. 31, 2023, pet. denied) (mem. op.). When determining whether such an award is excessive, the factfinder must consider evidence, if any, of: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the

degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties; (5) the extent to which the conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant. TEX. CIV. PRAC. & REM. CODE § 41.011; *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981); *see Sohani*, 2023 WL 1112165, at \*20.

Question No. 5 asked the jury: "What sum of money, if any, if paid now in cash, should be assessed against Mr. Swanson and awarded to Mr. Clack as exemplary damages, if any for the conduct found in response to Question Number 4?" In Question No. 4, the jury found that Swanson had acted with malice, and, as we have explained, that finding is not challenged on appeal. Question No. 5 defined "exemplary damages" as "an amount that you may in your discretion award as a penalty or by way of punishment," and the jury charge listed the six statutory and *Kraus* factors.

Under the *Kraus* factors, the evidence established that Swanson converted Clack's personal property causing economic harm. The evidence also established that Swanson converted the property despite the dismissal of his eviction suit and the constable's admonition to avail himself of legal process rather than to take matters into his own hands. In addition, the evidence showed that the property Swanson converted included tools and equipment that Clack used in his air conditioning repair and custom t-shirt businesses. And it showed that Swanson and

53

Clack met when Clack provided air conditioning repair services for Swanson. The jury could have reasonably concluded that Swanson was aware that the tools and equipment that were converted were items Clack used to earn a living. However, Clack did not testify that he lost work–or how much–due to the conversion.

Based on the evidence, the jury could have believed that Clack continued to occupy the house during 2019 without making any mortgage payments. Clack testified by November 2019, he had moved to a house in Grimes County, and he was returning to the house he bought from Swanson periodically to collect and move his possessions. Swanson argues that he entered the house only after determining that the utilities had been disconnected, which he saw as a clear indication that Clack had abandoned the property. Swanson maintains that he was trying to protect the house, an asset in which he had a financial interest. While the jury was free to disbelieve Swanson's testimony if it found him not to be credible, there was no evidence from which the jury could have found that Swanson did not have an interest in the house or that Clack was still living in it at the time of the conversion.

Finally, no evidence was admitted about Swanson's net worth. Clack relies on evidence that Swanson owned other properties valued at about $800,000. But no evidence was admitted regarding any of Swanson's liabilities, and evidence of the value of assets alone does not prove net worth. *Cf. In re House of Yahweh*, 266

S.W.3d 668, 674 (Tex. App.—Eastland 2008, no pet.) (conditionally granting mandamus when trial court's discovery order in gross negligence case was overly broad because it required production of documents showing only asset side of net worth equation).

Finally, we note that the jury's award of $200,000 in exemplary damages is within the statutory cap. See TEX. CIV. PRAC. & REM. CODE § 41.008(b). That alone, however, does not resolve the question of whether the award of exemplary damages was excessive. We must also consider whether the award is unconstitutionally excessive.

### D.      Due Process Considerations

Finally, Swanson argues that the exemplary damages award was unconstitutionally excessive. Although states "possess discretion over the imposition of punitive damages," these awards are subject to constitutional due process limitations. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). If an exemplary damages award is grossly excessive, the award "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 417.

### 1.      Guidepost Analysis

Appellate courts consider three guideposts when reviewing the constitutionality of an exemplary damage award: (1) the degree of reprehensibility

of the misconduct, (2) the disparity between the exemplary damage awarded and the actual harm suffered by the plaintiff or the harm likely to result, and (3) the difference between the exemplary damages awarded and the civil or criminal penalties that could be imposed for comparable conduct. *Bennett v. Grant*, 525 S.W.3d 642, 650 (Tex. 2017) (*Bennett II*) (citing *Campbell*, 538 U.S. at 418); *Gilbreath v. Horan*, 682 S.W.3d 454, 511 (Tex. App.—Houston [1st Dist.] 2023, pet. denied). Whether an exemplary damage award is unconstitutionally excessive is a question of law that we review de novo. *See Bennett II*, 525 S.W.3d at 650 (citing *Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex. 2004)).

The first guidepost—the degree of reprehensibility of a defendant's misconduct—is the most important of these factors. *Horizon Health Corp.*, 520 S.W.3d at 875 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)); *see generally Bennett v. Reynolds*, 315 S.W.3d 867, 874 (Tex. 2010) (*Bennett I*) (quoting *State Farm*, 538 U.S. at 419) (stating exemplary damages are permitted if wrongdoing "is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence"). Courts consider several non-exclusive factors when evaluating the degree of reprehensibility of a defendant's misconduct including whether (1) the harm inflicted was physical rather than economic, (2) the tortious conduct showed an indifference to or reckless disregard for the health or safety of others, (3) the target of the conduct had financial vulnerability, (4) the

conduct involved repeated actions, and (5) the harm resulted from intentional malice, trickery, or deceit. *See Bennett II*, 525 S.W.3d at 650.

"Courts should presume that compensatory damages make a plaintiff whole, so exemplary damages should be awarded only 'if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.'" *Sohani*, 2023 WL 1112165, at *20 (quoting *Campbell*, 538 U.S. at 419).

Additionally, although the Supreme Court has repeatedly declined to "impose a bright-line ratio" between harm to the plaintiff and the exemplary damages award, the Court has stated that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006); *Bennett II*, 525 S.W.3d at 651. The Texas Supreme Court has "noted that a ratio above 4:1 'might be close to the line of constitutional impropriety.'" *Bennett II*, 525 S.W.3d at 651 (quoting *Bennett I*, 315 S.W.3d at 878). In evaluating whether the ratio between compensatory and exemplary damages is excessive, courts must consider "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that has likely occurred." *Id.* (quoting *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993)).

57

Courts must examine (1) the exemplary damages award; (2) the actual damages, "defined as the harm that has likely occurred"; and (3) potential damages, defined as "the harm likely to result from defendant's conduct." *Id."*

## 2. Guidepost 1: Reprehensibility

The evidence showed that the harm inflicted by Swanson's conversion of Clack's property was economic rather than physical. No evidence indicated that Swanson acted with indifference to or reckless disregard for the health or safety of others. And the evidence showed that the conversion did not involve repeated actions. These factors do not strongly support that Swanson's conduct had a high degree of reprehensibility.

The evidence of Clack's financial vulnerability was limited. He testified that he fell behind in his mortgage payments after Hurricane Harvey in 2017. Clack said that, at that time, customers were primarily hiring repairmen who could accept insurance, and he was unable to do that. In addition, the evidence showed that Swanson had self-financed the sale of the house to Clack, but Clack equivocated when asked if he would have been able to secure a loan from a bank. The evidence also showed that Clack made no mortgage payments in 2019, but Clack also testified about purchasing items of personal property in 2019. This factor is equivocal in determining reprehensibility.

Finally, the jury found that Swanson acted with malice, and, as we have explained, that finding was not challenged on appeal. Considering the factors together, we conclude that the first guidepost weighs in favor of a finding that the award of $200,000 in exemplary damges is unconstitutionally excessive. *See Bennett II*, 525 S.W.3d at 650.

### 3. Guidepost 2: Disparity Between Exemplary Damages and Actual Harm

The jury awarded $200,000 in exemplary damages and $57,400 in compensatory damages. In the trial court, Clack sought judgment for $57,370, recognizing that the jury had overvalued the sawhorses he lost. The second guidepost requires us to analyze the ratio between the exemplary damages awarded and the actual harm suffered by the plaintiff or the harm likely to result. *See Bennett II*, 525 S.W.3d at 651. The ratio of $200,000 to $57,370 is approximately 3.5:1. While this is within the Supreme Court's 4:1 ratio of theorized constitutional propriety, the Supreme Court has cautioned against using a prescriptive ratio to analyze exemplary damage awards. *Bennett I*, 315 S.W.3d at 882. "Pushing exemplary damages to the absolute constitutional limit in a case like this leaves no room for greater punishment in cases involving death, grievous physical injury, financial ruin, or actions that endanger a large segment of the public." *Id.* at 883 (quoting *Tony Gullo Motors*, 212 S.W.3d at 310).

The jury awarded $57,370 to compensate Clack for damages that already occurred—the actual damages. Regarding potential damages, Clack had the burden of proof to show a probability, not merely a speculation, that he would suffer potential damages from Swanson's conduct. On appeal, Clack stresses the theft of equipment and tools that he used to earn his livelihood. But Clack did not provide any evidence of potential damages he would probably suffer due to Swanson's conversion. *See Bennett II*, at 651.

4.      **Guidepost 3: Difference Between Exemplary Damages and Civil or Criminal Penalties That Could Be Imposed**

This guidepost requires us to compare the exemplary damages with legislatively authorized civil penalties in comparable cases. *Id.* at 650–51. In *Bennett II*, the Supreme Court considered civil or criminal penalties for the defendant's malicious behavior, not for the underlying tort of conversion of cattle. *See id.* As to malicious conduct, Clack argues on appeal that Swanson acted maliciously by converting his property despite the dismissal of the eviction suit and the admonition from the constable. He does not identify any civil or criminal penalties related to either. He also argues that Swanson earned more than $100,000 profit by purchasing the house at auction and selling it to third party purchasers a week before the trial court ruled that the foreclosure was void. However, those facts are relevant to wrongful foreclosure, which Clack abandoned at trial by failing to submit an issue to the jury.

60

Finally, Clack argues that Swanson's conversion could subject him to punishment for third-degree felony theft. *See* Tᴇx. Pᴇɴ. Cᴏᴅᴇ § 31.03(e)(5). Punishment for a felony of the third degree carries a punishment range of 2 to 10 years, and may be accompanied by a fine not to exceed $10,000. *Id.* § 12.34. The Austin Court of Appeals suggested a remittitur on remand from the Texas Supreme Court in a similar situation: the court reduced $250,000 in exemplary damages to $10,000 based on the financial penalties for cattle theft, which resulted in a ratio of 1.877. *Bennett v. Reynolds*, No. 03-05-00034-CV, 2010 WL 4670270, at *5 (Tex. App.—Austin Nov. 18, 2010) (mem. op.), *supplemented*, 440 S.W.3d 660 (Tex. App.—Austin 2011, no pet.).

\* \* \*

Considering all three guideposts, as well as the *Kraus* and statutory factors, we conclude that the award of exemplary damages is excessive in this case. We sustain Swanson's ninth issue. While Texas has a legitimate interest in deterring and punishing Swanson's reprehensible conduct, that interest is not served by an award that is gratuitously excessive and amounts to an arbitrary deprivation of property. *See* Campbell, 538 U.S. at 417.

We may suggest a remittitur when there is evidence to support some damages, but not the amount awarded by the jury. *Hill v. Premier IMS, Inc.*, No. 01-15-00137-CV, 2016 WL 2745301, at *6 (Tex. App.—Houston [1st Dist.] May

61

10, 2016, no pet.) (mem. op.); TEX. R. APP. P. 46.3 ("The court of appeals may suggest a remittitur. If the remittitur is timely filed, the court must reform and affirm the trial court's judgment in accordance with the remittitur. If the remittitur is not timely filed, the court must reverse the trial court's judgment.").

We suggest a remittitur. We conclude a reasonable award of exemplary damages would be $114,740 equivalent to twice the amount of compensatory damages properly recoverable and resulting in a ratio of 2:1. The final judgment in this case awarded $178,045 in exemplary damages based on the trial court's reduction of the exemplary damages found by the jury. Accordingly, we suggest a remittitur of $63,305.

## III. Attorney's fees

In his fourth and fifth issues, Swanson challenges the award of trial attorney's fees, and in his sixth and seventh issues, he challenges the award of conditional appellate attorney's fees.

### A. Attorney's Fees Under the UDJA

Generally, a party may not recover attorney's fees unless authorized by statute or contract. *Wells Fargo Bank, N.A. v. Murphy*, 458 S.W.3d 912, 915 (Tex. 2015). The Uniform Declaratory Judgments Act (UDJA) authorizes a trial court to award "reasonable and necessary attorney's fees as are equitable and just." *See* TEX. CIV. PRAC. & REM. CODE § 37.009. An award of attorney's fees under the

UDJA is committed to the trial court's discretion, and we review such awards for an abuse of that discretion. *Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 270 (Tex. 2021); *Tex. Farm Bureau Mut. Ins. Co. v. Minchew*, No. 01-21-00330-CV, 2023 WL 3356703, at *10 (Tex. App.—Houston [1st Dist.] May 11, 2023, no pet.) (mem. op.). Section 37.009 requires that an award of attorney's fees be reasonable, necessary, equitable, and just. TEX. CIV. PRAC. & REM. CODE § 37.009 (stating that "court may award costs and reasonable and necessary attorney's fees as are equitable and just."). Reasonableness and necessity are questions of fact; whether the award is equitable and just are questions of law. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998); *Minchew*, 2023 WL 3356703, at *10.

The award of attorney's fees under section 37.009 is not dependent on a finding that the party "substantially prevailed." *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996). And once a claimant "has properly invoked the declaratory judgment statute, either party may plead for and obtain attorney's fees." *Knighton v. Int'l Bus. Machines Corp.*, 856 S.W.2d 206, 210 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *accord Holmes v. Cassel*, No. 01-16-00114-CV, 2017 WL 3389908, at *3 (Tex. App.—Houston [1st Dist.] Aug. 8, 2017, no pet.) (mem. op.) (holding that trial court had discretion to award attorney's fees "based on successfully defending against . . . claim for declaratory judgment").

This case began when Swanson filed suit against Clack for a declaratory judgment that his foreclosure was valid. Clack subsequently filed a reciprocal counterclaim for a declaration that the foreclosure was void, and he sought attorney's fees. The trial court rendered a summary declaratory judgment in Clack's favor, holding that the foreclosure was void. The trial court did not abuse its discretion by awarding attorney's fees under the UDJA. *See Knighton*, 856 S.W.2d at 210; *Holmes*, 2017 WL 3389908, at *3.

Swanson argues on appeal, however, that Clack's claim for attorney's fees related to his wrongful foreclosure claim, for which attorney's fees are not recoverable. "The elements of a wrongful foreclosure claim are: (1) a defect in the foreclosure sale proceedings; (2) a grossly inadequate selling price; and (3) a causal connection between the defect and the grossly inadequate selling price." *Green v. Fed. Nat'l Mortgage Ass'n*, No. 01-18-00258-CV, 2019 WL 1716347, at *2 (Tex. App.—Houston [1st Dist.] Apr. 18, 2019, pet. denied) (mem. op.). The jury was asked: "What is a reasonable fee for the necessary legal services for Mr. Swanson to have to pay for Mr. Clack's lawyers because he made Mr. Clack have to contest the validity of the disputed foreclosure and prove it was defective?" This question asks about Clack's reasonable and necessary fees for defending against Swanson's declaratory judgment claim. That the factual matter of the validity of the foreclosure overlaps with the first element of wrongful foreclosure is a

coincidence that does not deprive the trial court of its discretion to award attorney's fees under the UDJA.[10] *See Knighton*, 856 S.W.2d at 210; *Holmes*, 2017 WL 3389908, at *3.

We overrule Swanson's fourth issue.

## B. Segregation of Attorney's Fees

In issue five, Swanson asserts that the trial court erred by awarding trial attorney's fees based on the jury's verdict. He argues that the award is excessive, inequitable, and unjust. He maintains that the jury's verdict for attorney's fees was not supported by legally and factually sufficient evidence because the attorney's fees were not properly segregated.

Whether attorney's fees must be segregated is a question of law, which we review de novo. *Tony Gullo Motors*, 212 S.W.3d at 312–13. Parties seeking attorney's fees must "segregate fees between claims for which they are recoverable and claims for which they are not," except when "discrete legal services advance both a recoverable and unrecoverable claim." *Id.* at 311, 313–14. "The party seeking to recover attorney's fees carries the burden of demonstrating that fee segregation is not required." *Petrello v. Prucka*, 415 S.W.3d 420, 432 (Tex.

---

[10] And, in any event, Clack waived his counterclaim for wrongful foreclosure by failing to submit a question to the jury about the remaining elements. *See* TEX. R. CIV. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived.").

App.—Houston [1st Dist.] 2013, no pet.). Failure to segregate attorney's fees is not fatal to a claim for attorney's fees, however, because "unsegregated attorney's fees . . . are some evidence of what the segregated amount should be." *Tony Gullo Motors*, 212 S.W.3d at 314.

A challenge to a party's failure to segregate attorney's fees must be preserved with an objection. *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783 (Tex. 1988) (failure to object to jury question on attorney's fees that did require segregation waived issue for appeal); *Aero Energy, Inc. v. Circle C Drilling Co.*, 699 S.W.2d 821, 823 (Tex. 1985) (same). A challenge to the legal sufficiency of the evidence may be preserved by a motion for judgment notwithstanding the verdict. *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 312, 322 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 220 (Tex. 1992) (noting five ways to preserve no-evidence challenge)). A challenge to the factual sufficiency of the evidence may be preserved by a motion for new trial. *Pitts & Collard*, 369 S.W.3d at 322 ("A motion for new trial is a prerequisite to bringing a complaint on appeal alleging either that the evidence is factually insufficient to support a jury finding or that a jury finding is against the great weight and preponderance of the evidence." (citing TEX. R. CIV. P. 324(b)(2), (3))).

On appeal, Clack argues that Swanson waived this challenge by failing to object at trial. We disagree. As we have explained, the jury charge submitted a question on the reasonable and necessary attorney's fees for Clack's defense of Swanson's declaratory judgment. Because the issue was narrowed to the question of attorney's fees for the UDJA claim for which fees are recoverable, it asked only about properly segregated fees. Swanson is not arguing about the jury charge on appeal. Instead, he argues that because the evidence was not properly segregated, the jury's verdict was excessive and not supported by legally and factually sufficient evidence. In the trial court, Swanson filed a combined motion for judgment notwithstanding the verdict and motion for new trial, in which he argued that the evidence was legally and factually insufficient to support the award of attorney's fees because of improper segregation of fees for work on claims for which fees were unrecoverable. Accordingly, we conclude that Swanson properly preserved this challenge. *See Pitts & Collard*, 369 S.W.3d at 312, 322.

Texas follows the lodestar method to determine the amount of an award of attorney's fees.[11] *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d

---

[11] The lodestar method is a shorthand version of the *Arthur Andersen* factors that a factfinder should consider when determining the reasonableness of a fee. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 496 (Tex. 2019) (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (listing factors as (1) time and labor required, novelty and difficulty of questions involved, and skill required to perform legal service properly; (2) likelihood that acceptance of particular employment will preclude other

469, 496 (Tex. 2019). The lodestar method requires the factfinder to determine reasonable attorney's fees by first determining the reasonable hours spent by counsel in the case and the reasonable hourly rate for counsel's work. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). The fee claimant must provide sufficient evidence of both the reasonable hours worked and the reasonable hourly rate. *Rohrmoos*, 578 S.W.3d at 498. Sufficient evidence includes, at a minimum, evidence of (1) the nature of the work performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. *See id.*; *see also City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013) ("In *El Apple*, we said that a lodestar calculation requires certain basic proof, including itemizing specific tasks, the time required for those tasks, and the rate charged by the person performing the work."). The fee claimant must establish the reasonableness and necessity of its requested fees. *Rohrmoos*, 578 S.W.3d at 488.

---

employment by lawyer; (3) fee customarily charged in locality for similar legal services; (4) amount involved and results obtained; (5) time limitations imposed by client or by circumstances; (6) nature and length of professional relationship with client; (7) experience, reputation, and ability of lawyer or lawyers performing services; and (8) whether fee is fixed or contingent on results obtained or uncertainty of collection before legal services have been rendered)); *see also Mortell v. Scott*, No. 01-23-00018-CV, 2024 WL 5249086, at *13 (Tex. App.—Houston [1st Dist.] Dec. 31, 2024, no pet. h.).

At trial, Swanson's lawyer, Ira Joffe, testified that he worked on the case from April 12, 2018 to the date of trial, for a total of 300 hours. He backed out 73 hours that he worked on the case after the trial court granted summary declaratory judgment that the foreclosure was void on May 27, 2020. He also testified that he spent about 12 hours working on a title dispute that was separate from the issue of the void foreclosure that was the subject of the declaratory judgment claim. Joffe testified that he spent 215 hours on the foreclosure issue.

Joffe also testified about his experience and expertise and the hourly rate charged for similar services in the Houston area by attorneys with similar experience to his. He said that based on that information, $500 per hour was a reasonable hourly fee for his time. Joffe said that 215 hours at $500 per hour amounted to $107,500, which is what he was seeking in attorney's fees. He acknowledged, however, that he told Clack that his hourly rate was $450 when he began the representation. Joffe also testified that in the more than four years in which he represented Clack in this case, Clack paid only $1,600.

Joffe testified about the unusually arduous nature of the case and why it took so long to resolve the issue of the validity of the foreclosure. He explained that he is a sole practitioner and that his representation of Clack in this matter deprived him of the opportunity to work on other matters. Joffe's timekeeping records were also admitted into evidence. Joffe's records show that he began working on this

case on April 12, 2018. The records noted the date, the action taken, and the amount of time spent on the action.

While Joffe maintains that he spent 215 hours on the foreclosure issue that was the subject of the declaratory judgment claim, his basis for that determination was the date he began the representation, April 12, 2018, and the date that the trial court granted summary declaratory judgment in Clack's favor, May 27, 2022. While Joffe testified that he deducted about 12 hours for issues related to title insurance, his records indicate that he provided other discrete legal services that were unrelated to the declaratory judgment claim. For example, beginning in late November 2019, Joffe drafted multiple demands for Swanson to return Clack's personal property. This was related to Clack's conversion counterclaim, but it was not related to a determination of the validity of the foreclosure.

The jury awarded $96,750 for trial attorney's fees for defending against the declaratory judgment claim, which is the product of 215 (hours) times $450. This indicates that the jury did not discount the amount of time that Joffe testified he worked only on the validity of the foreclosure. Hence, the jury's verdict necessarily includes recovery for the attorney's fees accrued when Joffe provided discrete legal services that related only to the conversion claim. Common law conversion, as in this case, is a tort. *See Zapata v. Ford Motor Credit Co.*, 615

S.W.2d 198, 201 (Tex. 1981). Attorney's fees are not recoverable on tort claims. *See Tony Gullo Motors*, 212 S.W.3d at 304 n.5.

Because attorney's fees are not recoverable on tort claims, segregation of attorney's fees was required. *See id.* at 314. And because the judgment–based on the jury verdict–was based on improperly segregated fees, it was not supported by legally sufficient evidence. *See id.* Accordingly, we must reverse the fee award and remand the matter for a new trial on Clack's attorney's fees for defending against the declaratory judgment claim in the trial court. *Tony Gullo Motors*, 212 S.W.3d at 314; *Patriot Contracting, LLC v. Shelter Prods., Inc.*, 650 S.W.3d 627, 656–57 (Tex. App.—Houston [1st Dist.] 2021, pet. denied).

We sustain this issue.

### C. Appellate Attorney's Fees

In issues six and seven, Swanson challenges the trial court's award of contingent appellate attorney's fees, but at oral argument, Clack's counsel conceded that this appeal did not involve the claims for which attorney's fees are recoverable. Accordingly, without further discussion, we sustain issue six, and we render judgment that Clack take nothing on contingent appellate attorney's fees. We do not need to address issue seven. *See* TEX. R. APP. P. 47.1.

## Conclusion

We modify the judgment of the trial court to award Clack the amount of $57,370 in compensatory damages, and we affirm as modified. We suggest a remittitur of $63,305 of exemplary damages award in the trial court's judgment, to award Clack $114,740 in exemplary damages. In accordance with Rule 46.3 of the Texas Rules of Appellate Procedure, if Clack files with this Court, within fifteen days of the date of this opinion, a remittitur to that amount, the trial court's judgment on exemplary damages will be modified and affirmed. If the suggested remittitur is not timely filed, the trial court's judgment will be reversed, and the cause will be remanded to the trial court for a new trial. *See Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex. 1994) (holding that same jury must decide liability, actual damages, and exemplary damages); *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 95 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (stating that it would be "impossible" to follow *Moriel* and remanding only for new trial on punitive damages).

We render judgment that Clack take nothing on contingent appellate attorney's fees, and we reverse the award of trial attorney's fees and remand to the trial court for a new trial on Clack's trial attorney's fees for defending against the declaratory judgment claim.

Susanna Dokupil
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.